May it please the Court, my name is Gail Johnson and I represent Kendall Tankersley. I know that in many ways the issues that I've raised in the briefs in this case are quite technical. But I'd like to begin my remarks today taking a broader perspective. Because in Gall v. United States, the Supreme Court, I think, reminds all federal courts that their duty is to promote the perception of fair sentencing. If you look at Ms. Tankersley's case and the sentencing that happened here, it's difficult to perceive what happened as fair. Mr. Pfeiffer has done a nice job of encapsulating the scope of this conspiracy. It lasted for five years. My client was in it for only one-twelfth of that time, five months. She was involved due to her relationship with a boyfriend who got a free pass from the government, notwithstanding his significantly more extensive involvement. Ms. Johnson, what was the lowest sentence that the district court imposed on any conspirator in the case? Thirty-seven months for Darren Thurston. And she got 41? That's correct, Your Honor. So would she then be one of the lowest sentence defendants of all ten? That's correct, Your Honor. Okay. Go ahead. The district court here, of course, ruled that the terrorism enhancement technically didn't apply. The district court also ruled that application note 4 couldn't apply. Notwithstanding those rulings, she imposed an extraordinarily severe 12-level upper departure. I think it's impossible to read the Gall opinion from the Supreme Court without recognizing that the mitigating factors that were presented in that case are in equal measure matched by Ms. Tankersley's circumstances and, in fact, exceeded. Very quickly, both Brian Gall and Ms. Tankersley were only 21 years old at the time of their offense. They were both in the conspiracy for only a few months and then withdrew. Mr. Gall, frankly, out of a fear of apprehension. By contrast, Ms. Tankersley, because of her conscience. Both went on to obtain college degrees and to lead law-abiding lives until they were later prosecuted. Ms. Johnson, we're pretty familiar with the record. It would help me if you could address what we do in light of the Supreme Court's decision in Kimbrough versus the United States. What's your best argument as to why that case does not support what the district court did here in disagreeing with the congressional policy and imposing the terrorism in hand? I think it's clearly undisputed that that's what the district court did. She disagreed with congressional policy. The reason Kimbrough does not foreclose Ms. Tankersley's argument is that what the Supreme Court said in Kimbrough was the district court there did not disagree with congressional policy. Rather, the district court disagreed with sentencing commission policy as embodied in the guidelines. So the Supreme Court expressly found in Kimbrough, it expressly rejected the government's argument. In Kimbrough, we were dealing with the powder versus crack cocaine issue and the quantities and so on, and the commission had developed this elaborate structure by which we measured drugs and that drove the guidelines. The commission was obviously struggling with how to apply the terrorism enhancement, and at the time that these particular guidelines applied, the commission had not clarified what it later said in 2002, that it applies to domestic as well as international. It doesn't matter whether the victim is, as long as it's in retaliation. So that seems pretty analogous to me, and I guess I'd like to hear your thoughts on how we can distinguish Kimbrough. Of course, Your Honor. I think a close reading of the Kimbrough case shows that the Supreme Court there found that you cannot infer from congressional silence, meaning the fact that Congress had not acted to change the 100-to-1 crack cocaine disparity that appears throughout the guidelines. You cannot infer from that that that is their policy. That's what the Supreme Court said. Here in Ms. Tankersley's case, by contrast, we look at the plain language of the statute, Section 730 of the Anti-Terrorism and Effective Death Penalty Act of 1996, which states that the sentencing commission needs to alter the Chapter 3 terrorism guidelines so that it only applies to federal crimes of terrorism. I think this Court's inquiry ends with that plain language of the statute. And to the extent that that's ambiguous, certainly the rule of lenity would apply, or alternatively, if you look to the legislative history, we've cited some in our reply brief at page 12. It makes it even crystal clear that this federal terrorism enhancement is only supposed to apply. And I think that makes sense, because the purpose of the terrorism enhancement clearly is to significantly enhance the sentences of the worst of the worst offenders. Ms. Tankersley, I think, is probably precisely the kind of person Congress may have been worried would get swept up in this net. Well, I hate to go back to that, but as I understand it, she was a lookout the first time they tried to do what they did with the building, knowing full well what was going to happen. She knew it didn't go off. She was told to go up and remove the device, but she didn't. She rented the hotel when they were escaping. And then, after the fire didn't start the first time, she was back at it the second time. She didn't go out and start it, but she certainly was in the car when it was started and was right there with the other defendant. Now, that's the conduct we're really looking at, isn't it? That's correct, Your Honor. And on that conduct, it seems to me that one could find she is a minor participant in what happened here. She isn't a minimal participant at all, but quite a minor. Maybe a minor, but not minimal. And therefore, I'm trying to figure out how in the devil we changed what was sentenced here. I mean, when we did the first sentence, when she applied the 12-level enhancement, or upward departure, excuse me, she didn't even increase the criminal history category, nor did she increase the level. All she did was try to use that same 12-level upward departure to try to make everything even. So she was giving her every benefit of the doubt. Well, Your Honor, I think Gall teaches us that the guidelines are the initial benchmark and the starting point and that courts need to keep it in mind throughout the sentencing process. Oh, go ahead, go ahead. If I may finish. Yeah, go ahead. Even putting aside the minimal versus minor issue for a moment, accepting for the purposes of this argument for the moment that the minor role in offense was correct, without the 12-level departure, Ms. Tankersley's guideline range before any substantial assistance downward departure would have been 21 to 27 months. I think Judge Tallman asked one of the earlier litigants, how do we assess reasonableness in the rapidly changing area we find ourselves in? I think the answer comes from the Muhammad case. The Muhammad case doesn't say we throw the baby out with the bathwater. It specifically instructs appellate courts that you look at the prior limitations on the district court's departure authority. But the guidelines have always provided for outside-the-heartland departures, even before they became advisory. And really I think what Judge Smith is asking you is the same question I was asking you on Kimbrough. This is not your run-of-the-mill, burn-the-lumber-company-headquarter-down-to-sell-it-to-the-insurance-company arson. This is an arson that the district court found was committed for the purpose of retaliating against the lumber company and it had the effect of terrorizing an entire community. Why isn't it appropriate for the district court to conclude that this particular arson is outside the heartland of the typical arson guideline sentence and enhance accordingly? And what's unreasonable about doing that on this record? There's really two reasons if we look at the prior limitations on the court's departure authority. First of all, if I may just back up before we get to the heartland question, which I will address, 5K2.0 also makes it clear that before you can apply any departure under that guideline, it needs to be based on a factor that has not been adequately considered by the sentencing commission. Our position here is that what an outside-the-heartland adjustment is addressing, a factor that the district court determines was not adequately considered by the commission in setting the standard range for your run-of-the-mill sell-it-to-the-insurance-company arson fire? I believe it's a two-step process, Your Honor, and that these inquiries are distinct. First, it needs to be a factor that they haven't taken into consideration, and then you look at whether it's outside the heartland. Here, our position is the sentencing commission had taken this into consideration since they had a previous guideline back in 1989 that was later removed. It was 5K2.15. That was a more, shall we say, broader terrorism enhancement. They then replaced that with 3A1.4 to cover international, and then it was broadened to federal crimes of terrorism. With respect to the heartland issue, I would simply refer the court, for example, to the DIA case from this circuit as well as the Sarno case, both of which, again, are case law that limits the court's departure authority and stand for the principles that speculative harm or harm that's unduly attenuated from this individual defendant's conduct is not sufficient to support those kind of upward adjustments. Here, the communique was authored by Mr. Ferguson. It was issued by Mr. Thurston. It was too attenuated from Ms. Tankersley's conduct to be connected to her. Moreover, I think if the court looks at the record of the evidence that was presented by the government. Alito, I've got the same problem again with regard to the relevant conduct that I was asking Mr. Friedman earlier, and that is that she had a fairly extensive history of other protest-type activities that are set out in her pre-sentence report that was before the district court. Is that right? I'm referring to the burning of the logging trucks in Humboldt County and that sort of thing. Your Honor, there is some uncharged conduct which the district court expressly stated she was not considering as part of the sentence, and that's a ruling that the government has not appealed. And I see myself. Okay. I'll give you a minute on rebuttal. Thank you, Your Honor. Mr. Friedman. May it please the Court, after two complete sentencing hearings with testimony and lengthy arguments, the defendant received a 41-month sentence for a million-dollar arson that destroyed headquarters of a national wood products company. Her sentence was reduced twice by the district court from an original range of 78 to 97 months. The court departed down six levels, two more than the government recommended, to a 41-month sentence. The question, of course, is whether this sentence is reasonable under the Gaul standards, but I first want to deal with the legal question about whether the court could apply this upward departure for circumstances analogous to the terrorism guideline. Did Congress limit the discretionary authority of a district court to depart up or down based upon the facts of the case? I think to ask that question is to answer it, because historically, ever since the guidelines have been applied, there have been departures based upon how an individual committed a crime, aggravating and mitigating circumstances. And that's the whole basis of a 5K 2.0 general departure power on the part of the court. Now, if Congress had wanted to restrict this under the circumstances, it could have done so. All it did was mandate the creation of a federal terrorism guideline applying to crimes that targeted the government. It didn't address any other type of circumstances that would ordinarily be the reason for a departure. If Congress had wanted to limit it, it would have done what it did, for example, with mandatory minimums. That is something that Kimbrough obviously doesn't change. Mandatory minimums have to be abided by. There is a case cited as a supplemental authority by Ms. Johnson that deals with And courts cannot get around that and, in effect, create the same benefit of a fast-track program for another defendant if the U.S. attorney doesn't want to give them that benefit. That's something that's written into the law. It's not — it has nothing to do with the general overall authority to depart. I compare it to the career offender guideline. The career offender guideline at 28 U.S.C. 944H mandated by Congress in that statute is a very specific requirement that if somebody meets certain requirements as a career offender with prior convictions that Congress has stated involving drug trafficking or crimes of violence, there has to be a sentence close to the mandatory — close to the maximum. It didn't take long for this circuit and other circuits to say that doesn't prevent individual district courts from departing. That is a guideline required by Congress, but it doesn't limit the departure authority of the district court. And that's similar to what we have here. The mere fact that Congress created a guideline for crimes against the government doesn't mean that a district court, in the interest of fairness and equity and proportionality among defendants, can't look at facts that are very aggravated and apply a similar type of increase. Counsel, I'm worried about the district courts declining to grant the four-level downward adjustment for a minimal role. It doesn't seem to me that the court even made a finding about that. It doesn't seem to me that they even — she even discussed this defendant's role in retaliation — or in relation to the overall conspiracy. And so, therefore, that's a worry to me. Even if I do go along with the 12-level adjustment, how do I get to the decline to grant the four-level downward adjustment? Well, there are two aspects to that question, Your Honor. First is — and she went to great lengths in all these cases to look at how they fit within — individual defendants fit within the conspiracy. And she did that here when she's comparing her to people like Suzanne Savoy or Darren Thurston and others. Darren Thurston was the one who received the 37-month sentence. So that's in the record. She went to great lengths to compare and contrast individual defendants. But then there's the specific question of what she did in connection with the U.S. forest industry's arson. And the court said that she was initially willing to give her the minimal participant reduction of four levels, except for the fact, as the court pointed out, that she went back down there again and completed the arson. And that was a crucial factor, because at that time there were only two participants, Ferguson and Tankersley. And so, in effect, all she was doing was helping Ferguson at that point. He was the only person to compare it with. And the court has to look at all the facts that were before the court. She makes three trips down there, 165 miles from Eugene to Medford, three times in furtherance of this crime. And the court was saying, look, I can't give you an additional two levels when you're going to do that much more than you did initially. So I think she did address that. It's not some type of mathematical formula she applied. It's simply that she looked at her conduct and specified exactly what she did. So I think she fulfilled that requirement. I have to survey the whole record in order to say that she looked at it. I mean, I can't find any place in there where she specifically looked at that. All you're arguing is that if you look at the totality of the record, she had it generally in her mind. Isn't that what your argument is? She specified exactly the point. And that was the determining factor for Judge Aiken, that Tankersley went down a lot to complete this crime and, therefore, enhanced her role up from a minimal to minor. You're referring to the portion of the record where she basically said, I'd do it except you went back. Yes. I mean, that was what she focused on, honed in on. The communique. Now, this case, unlike the situation with Mr. Paul, there was a communique that Ms. Tankersley saw before it went out. She reviewed it, and she and Ferguson came up with the term grandma's to describe this particular fire. And it's important in this case because that communique, which is a very abusive, obscene communique, was reviewed by this defendant and went out after she had her role in it. So that communique clearly shows what her motivation was, to destroy U.S. forest industries because they dared to cut timber. And also, at the end of that communique, there's a warning to others who might do the same thing. So it was clearly intended to intimidate and coerce and retaliate against the U.S. forest industries. Thank you. Briefly, in terms of the minimal role adjustment, I think what the government's referring to in terms of overall proportionality takes into account many, many other things beyond that particularized inquiry. For example, the varying levels of substantial assistance that this group of defendants engaged in. But I guess the question is, in light of the statement that Judge Aiken made on the record, is that sufficient or not to say, well, I'll give you two, but I'm not going to go four because you went back a second time? Our position is that the judge made a legal error in not applying the correct standard, which is to look at Ms. Tankersley's role in the entire conspiracy rather than what she did do, which was to look at Ms. Tankersley's role. My question is, as a matter of law, is it sufficient for the district court to reject the defendant's request for a four-level departure and cut it to two by giving a reason, which we have in the record, for doing it? Is that impermissible? Is that your position? It's impermissible when the law requires her to make factual findings based on a different scope, namely the role in the entire conspiracy. That's our position. But the question is, did she play a minor role in the offense for which she was convicted? And if she pled to the arson and the district court was obviously bothered by the extent of her role, which was aggravated by the second visit, what more does the district court have to say in order to justify a refusal to go the four levels? And I'm sorry if I'm not answering the court's question well enough. Maybe I'm not articulating it very well. I think there's no question that the court's ruling was based on the wrong context, namely the U.S. Forest Industry's fires as opposed to the entire conspiracy. But that was the fire for which she was convicted. That's what the arson count was about. That's correct. But I believe it's under the Demers case from this circuit in 1994, as well as the Eighth Circuit case in Westermann, both stand for the principle that when you apply the mitigating role in the offense adjustment, you look at the scope of the entire conspiracy in that way. That only goes so far, though, because it suggests that the larger the conspiracy gets, the smaller somebody's sentence should be, even if the conduct's exactly the same. You take the same conspiracy and add 100 fires, well, her role was tiny, so she shouldn't get this amount of time. That doesn't really lessen her offense or lessen her behavior with regard to what she was convicted of. I appreciate the Court's point. Our position is also that her role here was minimal. First time she was a lookout. Second time she was a babysitter. Thank you. I know I'm over time. Thank you very much, Ms. Johnson. The case just argued is submitted, and the Court will take a 10-minute recess. Thank you.
judges: Tallman, Clifton, Smith